Reversed and Remanded and Opinion filed February 25, 2010.

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-08-00115-CV



 

CHASE HOME FINANCE, L.L.C., Appellant

V.

CAL WESTERN RECONVEYANCE
CORPORATION AND REAL TIME RESOLUTIONS, INC., Appellees

 



On Appeal from the 405th
District Court

Galveston County, Texas

Trial Court Cause No. 07-CV-0282



 

OPINION

The main issue in this case is whether, under the
doctrine of subrogation, appellant Chase Home Finance, L.L.C., as servicing
agent for HSBC Bank USA, N.A., trustee, should be subrogated to the rights of
the holder of a prior, superior lien.  If subrogation is allowed, then Chase’s
lien would be superior to the lien of appellee Real Time Resolutions, Inc.,
acting on behalf of RTR Properties, L.L.C., and the foreclosure of Chase’s lien
would cut off Real Time’s lien.  After a bench trial, the trial court concluded
that allowing subrogation would cause material prejudice to Real Time and on
this basis declined to grant subrogation.  Applying a prior precedent from this
court to the facts of this case, we conclude that as a matter of law Real Time would
not be prejudiced by granting subrogation to Chase.  Therefore, the trial court
erred by not granting Chase subrogation as a matter of law.  Accordingly, we
reverse the trial court’s judgment and remand to the trial court for a determination
as to the amount of attorney’s fees, if any, that should be awarded and for
rendition of a declaratory judgment in Chase’s favor.

I.  Factual and Procedural Background

            In December 2003, William and Suzanne Hughes sold lot 63 in a subdivision on Tiki
Island, Galveston County, Texas (“Property”) to Loyd Dickerson.  Aames Funding
Corporation d/b/a Aames Home Loan (“Aames”) loaned Dickerson the money for this
purchase.  Dickerson signed two purchase-money promissory notes in favor of
Aames—a $300,000 note (“Dickerson Note 1”) secured by a first deed-of-trust
lien (“Dickerson Lien 1”) and a $75,000 note (“Dickerson Note 2”) secured by a
second deed-of-trust lien (“Dickerson Lien 2”).  The deed and deeds of trust
were recorded in the Galveston County real property records in January 2004. 
The Dickerson notes and the liens securing them were later assigned to Wells
Fargo Bank, N.A. (“Wells Fargo”).

            Less than a month after
buying the Property, Dickerson signed a warranty deed conveying the Property to
Ruth Gooch.  This deed was recorded in the Galveston County real property
records in August 2004; however, the Dickerson liens were not discharged as part
of this transaction.

            Gooch filed for
bankruptcy protection, and later, in November 2004, she sold the Property to Mario
Landin.  In the contract between Gooch and Landin, the parties agreed that the
existing liens on the Property would be released at or before closing.  People’s
Choice Home Loan, Inc. (“People’s Choice”) advanced Landin the money for this
purchase. According to documents from this transaction, Stewart Title Company
(“Stewart Title”) served as settlement agent for the closing.  Landin signed
two purchase-money promissory notes in favor of People’s Choice—a $341,600 note
(“Landin Note 1”) secured by a first deed-of-trust lien (“Landin Lien 1”) and an
$85,400 note secured by a second deed-of-trust lien (“Landin Lien 2”).  The
deeds of trust were recorded in the Galveston County real property records in
February 2005.  The deed of trust that created Landin Lien 1 contains a
provision stating that the lender will be subrogated to any and all rights,
superior titles, liens, and equities of any owner or holder of an outstanding
lien and debt whose lien is paid off using the proceeds of Landin Note 1, even
if the holder releases the lien upon receiving payment.

A check in the amount of $348,482.63,
the full pay-off amount of Dickerson Note 1, was cashed in December 2004.  Aames’s
successor, Wells Fargo, signed a release of lien as to Dickerson Lien 1 in
December 2005, and this release was recorded in the Galveston County real
property records in January 2006.  Dickerson Lien 2 was not listed as an
exception in the title policy issued for this transaction.  After Dickerson
Note 1 was paid off and other closing items were paid, there remained
$57,471.71, which the title company paid to Gooch. Dickerson Note 2 was not
paid off, and Wells Fargo did not release Dickerson Lien 2.   

Effective June 2006, Landin Lien 1
and the note that it secured were assigned to HSBC Bank USA, N.A., trustee
(“HSBC”).  Chase Home Finance, L.L.C. is the servicing agent for HSBC.  

            HSBC foreclosed on Landin
Lien 1, and, on August 1, 2006, HSBC purchased the Property at the foreclosure
sale for $361,883.07, and the substitute trustee conveyed the Property to HSBC. 


After this foreclosure, Dickerson
Note 2 and Dickerson Lien 2 were assigned to RTR Properties, L.L.C., a company
for whom Real Time Resolutions, Inc. acts as the loan servicer.  In December
2006, Real Time Resolutions, Inc., acting on behalf of RTR Properties, L.L.C.
(hereinafter “Real Time”), appointed a substitute trustee under the deed of
trust for Dickerson Lien 2.  Real Time then posted the Property for an April
2007 foreclosure sale.

Appellant/plaintiff Chase Home Finance,
L.L.C. as servicing agent for HSBC (“Chase”) filed suit in the trial court to
prevent appellee/defendant Real Time from foreclosing on Dickerson Lien 2.[1] 
Chase obtained a temporary injunction preventing Real Time from foreclosing on
this lien.  Chase asserted that, because the proceeds from Landin Note 1 were
used to pay off Dickerson Note 1, the holder of Landin Lien 1 is subrogated to
the rights of the holder of Dickerson Lien 1.  Chase claimed that, because its
lien was superior to Dickerson Lien 2 under the doctrine of subrogation, the
foreclosure of this superior lien in August 2006 extinguished Dickerson Lien
2.  Chase asserted a slander-of-title claim and sought to quiet title and
obtain a declaratory judgment that its lien is superior to Dickerson Lien 2 and
that the Property is not encumbered by any lien in favor of Real Time.  Chase
sought attorney’s fees under the Declaratory Judgments Act.

Real Time counterclaimed asserting
that the Dickerson Lien 2 is superior to Chase’s lien and that Chase should not
be subrogated to the rights of the holder of Dickerson Lien 1 because it would
be inequitable to allow subrogation in this case.  Alternatively, Real Time
asserted that it was entitled to certain amounts as excess proceeds from the
foreclosure sale.  

Following a bench trial, the trial
court granted judgment in favor of Real Time, ordering that Chase take nothing
and declaring that Dickerson Lien 2 still encumbers the Property and has
priority status over any lien or interest of Chase.  The trial court awarded
Real Time attorney’s fees but did not award any actual damages to Real Time.

The trial court issued findings of
fact and conclusions of law, in which the trial court found the following:

·       
Chase asserts that the Landin Lien
1 entitles Chase to the same treatment as if Chase were the holder of the
Dickerson Lien 1 based on the doctrine of equitable subrogation.

 

·       
In determining the proper
application of the equitable-subrogation doctrine, the trial court considered
the facts and equities of this case.  

 

·       
The trial court considered various
factors listed in its findings.

·       
The factors listed by the trial
court showed that, if Chase were allowed to invoke the equitable-subrogation
doctrine in this case, Real Time would be materially prejudiced.

 

The trial court concluded
that Real Time was entitled to retain the Dickerson Lien 2 and that this lien
encumbers the Property and takes priority over any lien held by Chase.  The
trial court relied on the principle that a junior lienholder should not be
granted subrogation if the superior or equal equities of others with recorded
interests would be prejudiced thereby.  The trial court concluded that Real
Time was entitled to reasonable and necessary attorney’s fees under the Declaratory
Judgments Act.

II.  Issues Presented

            On appeal, Chase argues
that the trial court misapplied the law relating to subrogation and asserts
that the evidence is legally and factually insufficient to support the trial
court’s fact findings.

III.  Standard of Review

When reviewing the legal sufficiency
of the evidence, we consider the evidence in the light most favorable to the
challenged finding and indulge every reasonable inference that would support
it. City of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005).  We must
credit favorable evidence if a reasonable factfinder could and disregard
contrary evidence unless a reasonable factfinder could not. See id. at
827. We must determine whether the evidence at trial would enable reasonable
and fair-minded people to find the facts at issue.  See id. The
factfinder is the only judge of witness credibility and the weight to give to
testimony.  See id. at 819.

IV.  Analysis

A.        Trial Court’s Findings
Regarding Reasons for Denying Subrogation

Chase cites several cases and argues
that, under equitable-subrogation law, Chase is entitled to subrogation as a
matter of law, regardless of the factors cited by the trial court.[2] 
The trial court determined that Chase is not entitled to subrogation because
subrogation would result in material prejudice to Real Time.  The trial court
found that material prejudice would result based on the following factors:

11.1 If the equitable subrogation doctrine were applied in
this case, rather than being subordinated to a first lien loan with a fixed
interest rate, [Real Time] would be subordinated to the materially less
favorable interest rate of [Landin Lien 1], which was a variable rate subject
to probable exponential increase in the rate.  [Landin Note 1] would call for
over $100,000.00 in additional interest.  This would create a material
prejudice to [Real Time] if the equitable subrogation doctrine were applied in
this case.  

 

11.2 At the time of and in connection with the transaction
which is the subject of [Landin Lien 1], [People’s Choice] allowed the
borrower, Dickerson, to be released from his obligation under [Dickerson Lien
1] and accepted as its borrower Mario Landin. The new borrower was not properly
qualified, was not a suitable borrower for the loan transaction, and made very
few payments against the new mortgage before going into default.  People’s
Choice had a history of making poor and non-performing subprime mortgages with
very high initial fees and high increasing variable rate interest structures
with low teaser rates.  The subject Landin loan had all of those
characteristics.  People’s Choice qualified the borrower at the low interest
rate without regard to his lack of qualification as a borrower at the step-up
rate.  This borrower made three more similar real estate purchase loans just
before closing the subject loan.  And, in fact, People’s Choice went bankrupt
due to loans of this type.  This loan was a fraudulent loan.  The release of
Dickerson from the [Dickerson Lien 1] and the loan to the new, unqualified
borrower would create a material prejudice to [Real Time] if the equitable
subrogation doctrine were applied in this case.

 

11.3 [Landin Note 1] was over $41,000.00 greater than the [Dickerson
Note 1].  This increased loan amount would create a material prejudice to [Real
Time] if the equitable subrogation doctrine were applied in this case.

 

11.4 [Landin Note 1] was made to a borrower whose
financial status made the likelihood of foreclosure a very high probability
and, foreseeably, a payment default occurred and foreclosure was attempted. 
These additional foreclosure expenses are now also charges which could be met
before any second lienholders can be paid if the equitable subrogation doctrine
were applied in this case. This would create a material prejudice to [Real
Time] if the equitable subrogation doctrine were applied in this case.  

 

11.5 Permitting subordination [sic] as requested by Chase
would cause accrued interest from the original [Dickerson Lien 1] to be
converted under [Landin Lien 1] loan to principal, increasing the base from
which interest would be charged, thereby prejudicing the second lien holder with
a greater interest rate burden in front of its obligation from the borrower.

 

11.6 A reasonable second lienholder (such as [Real Time])
would not voluntarily subordinate its position to a note such as [Landin Note
1] because of the material prejudices created by any such subordination.

 

B.        Legal Insufficiency Regarding Some of the Trial
Court’s Findings 

Chase has challenged the legal
sufficiency of the evidence as to all of the above findings.  Regarding section
11.2, above, a representative of Real Time, Eric Green testified as follows:

·       
People’s Choice was “generally
known as a subprime lender.”

 

·       
People’s Choice “went bankrupt because
most of their loans did not pay off.”

 

·       
Landin “was a bad borrower who
took out many properties at that time and they all foreclosed and . . .
People’s Choice did not make that analysis, and they put a loan on the property
which was a horrible loan.”

 

Despite this testimony, we conclude that, under the applicable standard
of review, the evidence at trial would not enable reasonable and fair-minded
people to find as facts the parts of section 11.2 contained in the accompanying
footnote.[3] 
Because the evidence at trial is legally insufficient to support these parts of
section 11.2 of the trial court’s findings, we do not consider these findings
in the analysis that follows.[4]

The trial court also found that
People’s Choice and its successors, including Chase, had a duty to pay off Dickerson
Lien 2 and that they knew and acknowledged that they had a duty to pay the
amount necessary to extinguish this lien.  In addition, the trial court found
that People’s Choice assumed the responsibility to pay off Dickerson Lien 2.  There
is no written agreement in the record reflecting such a duty or assumption of
responsibility.  The record contains two deeds of trust and one promissory note
executed by Landin in favor of People’s Choice; however, none of these
instruments impose on People’s Choice the duty to pay off Dickerson Lien 2.  In
its closing instructions, People’s Choice states that the title policy should
not have an exception for a lien like Dickerson Lien 2, and Stewart Title’s
policy complied with this instruction.  The instructions do not state that Dickerson
Note 2 or Dickerson Lien 2 should be paid off.  Landin did not testify at
trial, nor did anyone who worked for People’s Choice.  None of the witnesses at
trial had personal knowledge regarding the scope of People’s Choice’s
agreement, if any, with Landin regarding his purchase of the Property.  At
trial, a representative of Chase, Deborah Baker, testified as follows:

·       
Chase was not involved in the
closing of the Landin purchase, and Baker does not have personal knowledge
regarding that transaction.  People’s Choice’s closing instructions to Stewart
Title stated that the title policy should be free from liens except for certain
items that did not include Dickerson Lien 2.  

 

·       
People’s Choice would not want a
lien ahead of its lien.  People’s Choice would know that if it did not pay off Dickerson
Lien 2, there could be a problem.



·       
A second lien like Dickerson Lien
2 is normally paid off.

 

·       
If a second lien like Dickerson
Lien 2 is not paid off, a lender would want a signed subordination agreement to
ensure that it was in the first position.

 

·       
If People’s Choice were aware of Dickinson
Lien 2, it would be a “proper thing to do to pay off” this lien.

 

A representative of Stewart
Title, Brandon Linscomb, testified as follows:

·       
People’s Choice’s closing
instructions stated that People’s Choice did not want an exception in the title
policy for a prior lien.   

 

·       
The closing statement for the sale
to Landin has a blank next to “Payoff of second mortgage loan.”  Linscomb does
not know what happened, but Stewart Title did not even appear to address
Dickerson Lien 2.

 

·       
Linscomb has no idea why Dickerson
Lien 2 was not paid.  

 

·       
Because Stewart Title was issuing
a title policy without showing Dickerson Lien 2 as an exception, that lien
should have been paid.  

 

·       
Stewart Title was getting closing
instructions from People’s Choice.  In most cases, depending upon the type of instructions,
Stewart Title would be acting upon the instructions of People’s Choice.

 

·       
Stewart Title’s responsibilities
are set forth in the closing instructions.  Stewart Title did not agree to pay
off Dickerson Lien 2.  The closing instructions speak to the requirements for
the title policy.  

 

Under the applicable standard of review, we conclude that the evidence at
trial would not enable reasonable and fair-minded people to find that People’s
Choice or Chase had a duty to pay Dickerson Lien 2, that People’s Choice or
Chase acknowledged that it had such a duty, or that either entity assumed the
responsibility to pay this lien.  See City of Keller, 168 S.W.3d
at 829–30. As this court held in Texas Commerce Bank, any intent or
attempt by People’s Choice to pay off Dickerson Lien 2 did not impose on
People’s Choice a legal duty to pay off this lien.  See Texas Commerce Bank
Nat’l Ass’n v. Liberty Bank, 540 S.W.2d 554, 557 (Tex. Civ. App.—Houston
[14th Dist.] 1976, no writ).  

C.        Application of Texas Commerce Bank National
Association v. Liberty Bank to the Subrogation Issue

 

In Texas Commerce Bank National Association v. Liberty Bank, this
court held that a bank lender was entitled to subrogation as a matter of law.  See
540 S.W.2d at 556–57.  In that case, a landowner’s property was encumbered with
a first lien and a second lien.  See id. at 555.  The landowner then
executed a deed of trust in favor of Texas Commerce Bank, giving that bank a
third lien on the property.  See id.  The landowner then conveyed the
property to a company that financed the purchase with a loan from Liberty Bank. 
See id. at 555–56.  To secure the loan from Liberty Bank, the company
executed a deed of trust in favor of Liberty Bank.  See id. at 556. 
This deed of trust contained a provision stating that if the proceeds of the
debt secured by the deed of trust were used to pay off any liens on the
property, then Liberty Bank would be subrogated to all of the rights of the
holders of the indebtedness that was paid.  See id.  The proceeds of the
Liberty Bank loan were used to pay off the balances remaining on the first-lien
note and the second-lien note, and the holders of these two senior liens
executed releases of their liens.  See id.  Liberty Bank tried to pay
Texas Commerce the amount due on the third lien on the property; however, the title
company was erroneously told that the amount due on the third lien was only
$1,319.80.  See id.  As a result of this error, more than $65,500 of the
proceeds of the Liberty Bank loan were forwarded to and kept by the seller of
the property.  Texas Commerce asserted that the erroneous determination of the
pay-off figure for the third lien was due to the negligence of Liberty Bank and
its agent.  Liberty Bank asserted that Texas Commerce’s negligence caused the
error.  See id.  

Shortly after the closing of the purchase of the property by the company
with the Liberty Bank loan, Texas Commerce foreclosed on its lien and bought
the property at the trustee’s sale.  See id.  The company later
defaulted on the Liberty Bank loan, and Liberty Bank foreclosed on its lien.  See
id.  At the trustee’s sale, Liberty Bank bought the property for an amount
less than the total of the amount of the two liens that Liberty Bank had paid off. 
See id.    

Liberty Bank sued Texas Commerce and others.  See id. at 555.  Liberty
Bank moved for summary judgment asserting that, as a matter of law, Liberty Bank
was subrogated to the rights of the holders of the senior liens and that it
purchased the property at its foreclosure sale free of Texas Commerce’s lien.  See
id. at 556.   Liberty Bank asserted that its alleged negligence in
ascertaining the pay-off amount of the seller’s debt to Texas Commerce was
irrelevant to whether Liberty Bank was entitled to subrogation.  See id. 
Texas Commerce asserted that Liberty Bank’s negligence in failing to ascertain
the correct pay-off amount precluded the subrogation of Liberty Bank to the
rights of the holders of the senior liens.  See id.   Texas Commerce
argued that fact issues regarding Liberty Bank’s alleged negligence and the
alleged prejudice to Texas Commerce precluded summary judgment.  See id.
at 556.   

The trial court granted summary judgment, and this court affirmed the
trial court’s summary judgment, relying on the Supreme Court of Texas’s opinion
in Providence Institution for Savings v. Sims.[5]
See id. at 556–57.  Texas Commerce asserted it was prejudiced by
Liberty Bank’s transfer of the remainder of the loan proceeds to the seller
rather than to pay off the Texas Commerce loan.  See id. at 557.  This
court, concluding that there was no prejudice to Texas Commerce as a matter of
law, held that Liberty Bank was expressly subrogated to the rights of the
holders of the two senior liens under Liberty Bank’s deed of trust, and that
this subrogation did not prejudice Texas Commerce.  See id.  This court
stated that, both before the pay-off of the senior liens by Liberty Bank and
after this pay-off and subrogation of Liberty Bank to the senior position,
Texas Commerce was entitled to the amount remaining after the amounts of these
liens were subtracted from the proceeds of the foreclosure sale in a
foreclosure of the two senior liens.  See id.  The amount received at
the foreclosure of Liberty Bank’s lien did not exceed the sum of the amounts of
the two prior superior liens that Liberty Bank paid off.  See id.      

      This court concluded that, even though Liberty Bank attempted
unsuccessfully to pay off the debt to Texas Commerce, Liberty Bank had no legal
duty to discharge this debt.  See id.  This court found that, as a
matter of law, there was no prejudice to Texas Commerce in allowing Liberty Bank
to be subrogated to the rights of the prior senior lienholders. See id. 
Neither actual nor constructive knowledge of an intervening lien would defeat
the right of subrogation if the senior lien were discharged under an express
agreement by the debtor that the lender would be entitled to subrogation.  See
id.  This court concluded that Liberty Bank’s negligence was not relevant
when the right of subrogation was based in part on such an agreement and was
not wholly dependent on equitable principles.  See id.  This court also held
that Liberty Bank’s right to subrogation was not affected by the prior
lienholders’ execution of releases of lien rather than assignments of lien to
Liberty Bank.  See id.    

The facts in Texas Commerce Bank are substantially similar to the
facts in this case.  Though not entirely clear, it appears that the
amount paid for the property in Liberty Bank’s foreclosure in Texas Commerce
Bank was less than the total amount paid by Liberty Bank to pay off the
senior debt.  See id. at 556.  In the case at hand, People’s Choice paid
$348,482.63 in December 2004, to satisfy Dickerson Note 1; however, at the
foreclosure sale in August 2006, Chase paid $361,883.07.  Nonetheless, a party
entitled to subrogation based on its paying off of a prior lien is subrogated
in the amount of the sum paid by that party plus legal interest thereon from
the date of payment, which in this case would be six percent per annum from
December 30, 2004.[6] 
See Tex. Fin. Code Ann. §
302.002 (Vernon 2006); American Centennial Ins. Co. v. Canal Ins. Co.,
843 S.W.2d 480, 485 (Tex. 1992) (Hecht, J., concurring op., joined by four
other justices); Phipps v. Fuqua, 32 S.W.2d 660, 663 (Tex. Civ.
App.—Amarillo 1930, writ ref’d); Williams v. Daniel, 30 S.W.2d 711, 715
(Tex. Civ. App.—Fort Worth 1930, writ ref’d); see also Vogel v. Glickman,
117 F. Supp. 2d 572, 577 (W.D. Tex. 2000) (applying Texas law), aff’d, 276
F.3d 729 (5th Cir. 2002).  With this legal interest, the amount to which Chase
was subrogated exceeded $361,883.07 on the date of the foreclosure sale (August
1, 2006).  Therefore, as in Texas Commerce Bank, the amount paid at the
foreclosure sale was less than the subrogation amount as of the foreclosure
sale date.

The trial court appears to have evaluated prejudice based on the
presumption that, if subrogation were granted, it would have to be as to all
amounts owed under Landin Note 1.  Therefore, the trial court considered the
fact that, although the initial interest rate of Landin Note 1 was lower than Dickerson
Note 1, after two years, Landin Note 1 changed to a high, variable interest
rate.  However, if subrogation were granted, priority would be given only to
the $348,482.63 paid by People’s Choice plus six-percent interest thereon from
the date of payment.  See Tex.
Fin. Code Ann. § 302.002; American Centennial Ins. Co., 843
S.W.2d at 485; Phipps, 32 S.W.2d at 663; Williams, 30 S.W.2d at
715.  Therefore, the difference in interest rates is not material to the
analysis.  

The trial court also emphasized that Landin was a borrower with a high
likelihood of default.  First of all, this testimony was based on speculation
by the corporate representative of Real Time premised on the terms of the
Landin purchase rather than on a credit report or other direct information
regarding Landin’s creditworthiness.  Even presuming a high risk that Landin
would default, there is no evidence that this risk of default was higher than
the risk associated with Dickerson.  Although the record also lacks direct
information regarding Dickerson’s creditworthiness, it reflects that, less than
a month after purchasing the Property with no down-payment, Dickerson conveyed
title to Gooch and warranted to her that the Property was free from all
encumbrances.  In fact, the Property was encumbered with two liens from the
recent closing. After making at most a few payments against his indebtedness to
Aames, Dickerson stopped paying, and his loan went into default.  There is no
evidence in the record that Gooch assumed Dickerson’s indebtedness, and at the
time of the sale to Landin, Gooch had filed for bankruptcy protection.  Even if
it were appropriate to consider prejudice arising from the substitution of
Landin in place of Dickerson as the debtor, the record evidence is legally
insufficient to support a finding that this change was prejudicial.  

This court’s opinion in Texas Commerce Bank is on point. Absent a
decision from a higher court or this court sitting en banc that is on point and
contrary to the prior panel decision or an intervening and material change in
the statutory law, this court is bound by the prior holding of another panel of
this court. See D’Arcy v. Mead, No. 14-04-01220-CV, 2006 WL 2165733, at
*3 (Tex. App.—Houston [14th Dist.] Aug. 1, 2006, pet. denied) (mem. op.); City
of Webster v. City of Houston, No. 14-04-00353-CV, 2005 WL 913813, at *1
(Tex. App.—Houston [14th Dist.] Apr. 19, 2005, no pet.) (mem. op.). We have not
found a decision from a higher court or this court sitting en banc that is on
point and contrary to this prior panel decision, and research has revealed no
intervening and material change in the statutory law that would affect this
prior panel decision.  Therefore, we are bound by this court’s prior decision
in Texas Commerce Bank.  Under that precedent, Chase is entitled to
subrogation as a matter of law, notwithstanding the factors listed by the trial
court.[7]


            Real Time asserts that
the facts of the case at hand are substantially similar to those in Fleetwood
v. Med Center Bank, 786 S.W.2d 550, 554–56 (Tex. App.—Austin 1990, writ
denied) (“Fleetwood I”), a case upon which the trial court relied in its
conclusions of law. In that case, Fleetwood held a note secured by a deed of
trust in real property, and Fleetwood also owned a lease interest in the real
property that was subordinated to that deed of trust.  See Fleetwood
I, 786 S.W.2d at 552.  A subsequent lender advanced funds that were used by
the debtor to completely pay off the note and deed of trust held by Fleetwood. 
See id.  The trial court granted summary judgment, concluding that the
subsequent lender was subrogated to Fleetwood’s right under his deed of trust. 
See id.  The Third Court of Appeals reversed, relying primarily on a
prejudice theory based on a loss of “protection.”  See id. at 555–56.  Under
this theory, the Fleetwood I court concluded that there was a fact issue
as to whether granting subrogation to the subsequent creditor would prejudice
Fleetwood because it would give a third party control over a deed-of-trust lien
superior to his leasehold interest.  See id.  The Fleetwood I
court reasoned that Fleetwood’s holding of this superior lien provided some
protection for his leasehold interest because it allowed Fleetwood to avoid
foreclosing on the lien and cutting off his subordinate leasehold interest.   See
id.  

            In the case at hand, Real
Time relies upon this protection theory from Fleetwood I; however, Real
Time fails to address the second appeal in Fleetwood.  See Med
Center Bank v. Fleetwood, 854 S.W.2d 278 (Tex. App.—Austin 1993, writ
denied) (“Fleetwood II”).  After trial on remand resulted in a judgment
in favor of Fleetwood, the subsequent lender appealed.  See id.  The Fleetwood
II court held that, as a matter of law, the subsequent lender was
subrogated to Fleetwood’s lien.  See id. at 285–87.  The Fleetwood II
court noted that the facts and issues were more well-developed in the second
appeal than in the first appeal; however, the Fleetwood II court concluded
that Fleetwood’s loss-of-protection argument was not a legal or vested right
and that it did not raise a fact issue that would support the trial court’s
judgment.  See id.  The Fleetwood II court effectively abandoned the
loss-of-protection theory announced in Fleetwood I, and the author of
the Fleetwood I opinion noted this fact in a dissenting opinion in Fleetwood
II.  See id. at 290 (Jones, J., dissenting).  Research has revealed
no Texas case other than Fleetwood I in which a court has adopted the
loss-of-protection theory of prejudice in a subrogation analysis, and the Third
Court of Appeals itself has abandoned this theory.  We decline to adopt this
analysis from Fleetwood I.  We also note that the decision in Fleetwood
II supports our analysis in this case.  See Fleetwood II, 854
S.W.2d at 285–87.

Real Time also asserts that, even if there is a subrogation agreement,
the granting of subrogation arises in equity and therefore requires that the
court weigh the equities.  Real Time argues that, in determining whether a
court should allow a party to be subrogated to the rights of another, each case
turns on its own facts, and the trial court must weigh the equities in light of
all of the facts and circumstances.  If one party seeks subrogation based on a
contract that it has with all of the parties who are disputing its right to
subrogation, this situation would be one of purely contractual subrogation.  If
one party seeks subrogation and no language from any instrument speaks directly
to that party’s ability to subrogate, then that situation would be one of
purely equitable subrogation.  

The parties in this case argue over whether this case involves purely
contractual subrogation or purely equitable subrogation.  In cases like the one
at hand, there is no contract between the two lenders who are disputing whether
the subsequent lender is entitled to subrogation; however, there is an express deed-of-trust
provision between the debtor and subsequent lender stating that, if proceeds are
used to pay off a prior debt, the lender will be subrogated to all rights of
the prior lienholder.  Under precedent from the Supreme Court of Texas, such
cases fall into a third, hybrid category.  In these cases, the right of
subrogation is not wholly dependent on the application of a contract, and it is
not wholly dependent on equitable principles.[8] 
See Sims, 441 S.W.2d at 519–20; Fleetwood II, 854 S.W.2d at 287; Texas
Commerce Bank, 540 S.W.2d at 557.  In such cases, though the analysis does
involve equitable considerations, each case is not controlled by its own facts,
and the subsequent lender can be entitled to subrogation as a matter of law.  See
Sims, 441 S.W.2d at 519–21; Fleetwood II, 854 S.W.2d at 287–88; Texas
Commerce Bank, 540 S.W.2d at 557.  In these cases, the subsequent lender’s
actual or constructive knowledge of the lien previously filed by the other lender
does not defeat the subsequent lender’s right to subrogation. See Sims,
441 S.W.2d at 519–20; Fleetwood II, 854 S.W.2d at 287; Texas Commerce
Bank, 540 S.W.2d at 557.  Likewise, in such cases, the subsequent lender’s
alleged negligence is not relevant to the subrogation analysis. See Sims,
441 S.W.2d at 519–20; Fleetwood II, 854 S.W.2d at 287; Texas Commerce
Bank, 540 S.W.2d at 557.   

For these reasons, we conclude that,
under Texas Commerce Bank, Real Time and its predecessors in interest
would not be prejudiced if Chase were granted subrogation, and the trial court
erred by not granting subrogation as a matter of law.[9] 
See Texas Commerce Bank, 540 S.W.2d at 555–57; Fleetwood II,
854 S.W.2d at 285–87.

D.        Chase’s Proof of Entitlement to Subrogation  

On appeal, Real Time asserts that
Chase did not prove its entitlement to subrogation at trial because there is no
evidence that the proceeds of Landin Note 1 were used to pay off Dickerson Note
1.  The uncontroverted evidence at trial shows the following:

·       
On December 3, 2004, a law firm
prepared a document showing the payoff amount for a debt owed by Loyd
Dickerson, loan number 1205122564, with a current unpaid principal balance of
$299,720.71.  The original principal amount of Dickerson Note 1 was $300,000.  According
to this document, if payment were made by December 30, 2004, then the payoff
amount for this debt would be $348,482.63, and this amount should be paid to
America’s Servicing Company (“Servicing Company”).  The document also stated
that the law firm should be paid $755.09 for attorney’s fees.

 

·       
A closing statement form and a
disbursement worksheet prepared by Stewart Title stated that the Stewart Title
file number for the transaction in which Landin purchased the Property was
04202435.  These documents show the same payoff amounts as stated in the
document from the law firm.  The disbursement worksheet shows that, on December
23, 2004, Stewart Title issued a check for $348,482.63 payable to the Servicing
Company and a check for $755.09 payable to the law firm.  

 

·       
The record contains copies of
these two checks, which contain the Stewart Title file number for the Landin
closing.  Correspondence between Stewart Title and the law firm shows that, on
December 23, 2004, Stewart Title sent the two checks to the Servicing Company
in care of the law firm.  The record contains a cover letter showing that the
law firm sent the payoff check to the Servicing Company on December 27, 2004. 
This cover letter makes reference to the same loan number as that contained in
the law firm’s statement of the payoff amount.

 

·       
The reverse side of this check
shows that the Servicing Company endorsed the check on December 28, 2004, and
that it was negotiated on December 30, 2004.  

 

·       
On February 21, 2005, Stewart
Title sent the law firm a letter referencing the file number for the Landin
transaction, describing the Property, and containing the loan number for the
debt that had been paid off.  Attached to the letter was a release-of-lien
document to be executed.  

 

·       
On December 19, 2005, Wells Fargo
executed a release of lien.  On January 18, 2006, this document was recorded at
the request of the Servicing Company.  This release refers to the same loan
number as that contained in the law firm’s statement of the payoff amount.  In
the release, Wells Fargo states that it is the owner of the lien in question
and that this lien has been paid in full and satisfied.  The lien in question
is described using the recording information for Dickerson Lien 1.  The “Original
Borrower” is listed as Loyd Dickerson and the “Original Beneficiary” as Aames. 


 

Real Time asserts that the evidence
is insufficient to prove that the proceeds from Landin Note 1 were used to pay
off Dickerson Note 1.  Real Time focuses on the fact that the payoff documents
and check refer to the Servicing Company and that the release was executed by
Wells Fargo, rather than the Servicing Company or Aames.  Real Time also notes
that the release was signed almost one year after the closing of the Landin
transaction.  Based on the above-described evidence, which was undisputed, we
conclude that the evidence at trial conclusively proved that the proceeds from Landin
Note 1 were used to payoff Dickerson Note 1, which was secured by Dickerson
Lien 1.  This evidence would not enable reasonable and fair-minded people to
find otherwise.[10] 
See City of Keller, 168 S.W.3d at 829–30.

E.        The Extent of Chase’s
Entitlement to Subrogation

In the alternative, Real Time argues
that, even if Chase is entitled to subrogation, the amount to which it should
be subrogated is limited to the original principal amount of Dickerson Note 1,
$300,000.  The cases upon which Real Time relies do not support this
proposition; rather, as discussed above, if a party pays off a prior lien and
is entitled to subrogation, the subrogation amount is the payoff amount plus
legal interest thereon from the date of payment.  See Tex. Fin. Code Ann. § 302.002 (Vernon
2006); American Centennial Ins. Co., 843 S.W.2d at 485; Phipps,
32 S.W.2d at 663; Williams, 30 S.W.2d at 715; see also Vogel, 117
F. Supp. 2d at 577.  The subrogation amount is not limited to the original principal
amount of the prior debt that has been paid.  See American Centennial
Ins. Co., 843 S.W.2d at 485; Phipps, 32 S.W.2d at 663; Williams,
30 S.W.2d at 715; see also Vogel, 117 F. Supp. 2d at 577.  

F.        Chase’s Ability to Recover Attorney’s Fees
under the Declaratory Judgments Act

 

Though the trial court awarded Real Time attorney’s fees under the
Declaratory Judgments Act, Real Time asserts that Chase cannot recovery
attorney’s fees under this statute.  Real Time cites a line of cases that hold
attorney’s fees are not available in a suit to quiet title or remove a cloud on
title.  See, e.g., Southwest Guaranty Trust Co. v. Hardy Road 13.4
Joint Venture, 981 S.W.2d 951, 956 (Tex. App.–Houston [1st Dist.] 1998,
pet. denied). Though Chase asserted claims in the trial court for slander of
title and brought suit to quiet title, in this court Chase seeks only declaratory
relief as a matter of law and attorney’s fees, which Chase also requested in
the trial court. Under the Declaratory Judgments Act, “[a] person interested
under a deed, will, written contract, or other writings constituting a contract
or whose rights, status, or other legal relations are affected by a statute,
municipal ordinance, contract, or franchise may have determined any question of
construction or validity arising under the instrument, statute, ordinance,
contract, or franchise and obtain a declaration of rights, status, or other
legal relations thereunder.”  Tex. Civ.
Prac. & Rem. Code Ann. § 37.004(a) (Vernon 2008).  The declaratory
relief that Chase seeks in this court is not a judgment quieting or
adjudicating title; rather, it is a judgment determining the validity of
competing instruments and resolving a dispute between two purported
lienholders.  Therefore, the trial court has the discretion to award Chase
reasonable and necessary attorney’s fees.  See Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon 2008); Red
Rock Properties 2005, Ltd. v. Chase Home Finance, L.L.C., No.
14-08-00352-CV, 2009 WL 1795037, at *5–6 (Tex. App.—Houston [14th Dist.] June
25, 2009, no pet.) (mem. op.); Aquaduct, L.L.C. v. McElhanie, 116 S.W.3d
438, 444–45 (Tex. App.—Houston [14th Dist.] 2003, no pet.).  

V.  Conclusion

Under the applicable standard of review, the evidence
presented at trial is legally insufficient to support the trial court’s
seventeenth finding of fact as well as the portions of the fourteenth finding
and of section 11.2 of the findings of fact discussed above.  The trial evidence
conclusively proves that the proceeds from Landin Note 1 were used to payoff
Dickerson Note 1, which was secured by Dickerson Lien 1.  Under Texas
Commerce Bank, Real Time and its predecessors in interest are not prejudiced
by granting subrogation to Chase, and the trial court erred by not granting
subrogation in favor of Chase as a matter of law.  The amount of this
subrogation is not limited to $300,000; the subrogation amount is $348,482.63,
plus six-percent interest per annum from December 30, 2004.  

The award of attorney’s fees and costs in a
declaratory judgment action is within the trial court’s discretion and is not
dependent upon a finding that a party substantially prevailed.  See Barshop
v. Medina, 925 S.W.2d 618, 637–38 (Tex. 1996).  Because our disposition of
the case on appeal substantially affects the trial court’s judgment, remand is
warranted so that the trial court can address what costs and attorney’s fees,
if any, should be awarded under the Declaratory Judgments Act.  See id.;
Fitzgerald v. Antoine Nat’l Bank,  980 S.W.2d 228, 232 (Tex. App.—Houston
[14th Dist.] 1998, no pet.).  Accordingly, we reverse the trial court’s
judgment, and we remand to the trial court with instructions to (1) determine
the amount, if any, of costs and reasonable and necessary attorney’s fees that
should be awarded under the Declaratory Judgments Act;[11]
and then (2) render a judgment in which the trial court:

·       
orders that Real Time Resolutions, Inc. take nothing by its
counterclaim;

·       
declares that, at all times relating to the August 2006
foreclosure sale, Landin Lien 1 (Plaintiff’s Exhibit 6 at trial) was superior
to Dickerson Lien 2 (Plaintiff’s Exhibit 2 at trial); and

·       
declares that the foreclosure of Landin Lien 1 cut off and
extinguished any lien in favor of Real Time Resolutions, Inc. and Cal Western
Reconveyance Corporation.

In its judgment, the trial
court shall award such costs and reasonable and necessary attorney’s fees as
the trial court determines are equitable and just.

 

 

                                                                                    

                                                                        /s/        Kem
Thompson Frost

                                                                                    Justice

 

 

Panel
consists of Justices Yates and Frost and Senior Justice Sears.*  









[1]
Chase also sued appellee/defendant Cal Western Reconveyance Corporation,
another servicing agent.





[2]
Chase also asserts that, under Fortis
Benefits v. Cantu, the presence of the subrogation language in Landin Lien
1 entitles Chase to contractual subrogation without any consideration of the
equities, and that the trial court erred by considering the equities.  See
234 S.W.3d 642, 646 (Tex. 2007).  We presume, without deciding, that this
argument lacks merit.  Therefore, we need not address Real Time’s argument that
Chase waived this argument by failing to plead it.  

 





[3]
“The new borrower was not properly qualified, was not a suitable borrower for
the loan transaction . . . People’s Choice had a history of making poor and
non-performing subprime mortgages with very high initial fees and high
increasing variable rate interest structures with low teaser rates. . . People’s
Choice qualified the borrower at the low interest rate without regard to his
lack of qualification as a borrower at the step-up rate.  This borrower made
three more similar real estate purchase loans just before closing the subject
loan.  And, in fact, People’s Choice went bankrupt due to loans of this type. 
This loan was a fraudulent loan.”





[4]
We presume for the sake of argument that the evidence is legally sufficient to
support the trial court’s findings in sections 11.1, 11.3 to 11.6, and the
parts of section 11.2 not contained in the previous footnote.





[5]
441 S.W.2d 516, 519 (Tex. 1969).  





[6]
Dickerson Note 1 had a fixed interest rate of nine percent per annum.





[7]
We do not consider the parts of section 11.2 that have been found not to be
supported by legally sufficient evidence.  





[8]
On appeal, Real Time asserts that Chase waived the doctrine of contractual
subrogation by failing to plead it.  This waiver argument appears to be
directed only to Chase’s argument based on purely contractual subrogation, a
theory on which this court does not rely in adjudicating this appeal.  To the
extent this waiver argument is directed at the hybrid subrogation analysis, we
conclude that, under a liberal construction of Chase’s live pleading at trial,
subrogation in this regard was sufficiently pleaded.  





[9]
Real Time also argues that Chase is not entitled to subrogation because it did
not request or obtain a fact finding regarding its theory of subrogation.  No
such request or finding is needed. The evidence conclusively proved Chase’s
entitlement to subrogation.  

 





[10]
Real Time also argues that Chase is not entitled to subrogation because it did
not request or obtain a fact finding that the proceeds from Landin Note 1 were used to payoff Dickerson
Note 1.  No such request or finding is needed in this case.  The evidence
conclusively proves this proposition.  





[11]
The parties stipulated that $50,000 would be a reasonable and necessary
attorney’s fee for Chase.  On remand, the trial court may exercise its
discretion to award this amount; however, the trial court also may exercise its
discretion to award no attorney’s fees or to award another amount that the
trial court finds is reasonable and necessary.





*  Senior Justice Ross A. Sears sitting by assignment.